## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| A.B., a minor child, by and through her Parent and Legal Guardian SHERRI BLAIK,[1]      ) )<br> ) | |
| Plaintiff,      ) ) | |
| v.      ) ) | Case No. CIV-19-968-D |
| HEALTH CARE SERVICE CORPORATION, ) d/b/a/ BLUE CROSS BLUE SHIELD OF OKLAHOMA,      ) ) ) | |
| Defendant.      ) | |

## O R D E R

Before the Court is Defendant Health Care Service Corporation's Motion for Summary Judgment [Doc. No. 136], filed under Fed. R. Civ. P. 56.[2] Plaintiff A.B., by and through her mother Sherri Blaik, filed a Response [Doc. No. 152], and Defendant replied [Doc. No. 158]. The Court later allowed Plaintiff to file a supplement [Doc. No. 169], and Defendant replied [Doc. No. 172]. The Motion is fully briefed and at issue.

### Background

Plaintiff A.B, acting through Sherri Blaik, brings claims for breach of contract and breach of the insurer's duty of good faith and fair dealing as stated in the Second Amended

---

[1] The case was initiated by Sherri Blaik individually and on behalf of her minor child, A.B. The caption of this Order reflects the current parties.

[2] The Court authorized sealed filings of Defendant's Motion and the parties' briefs to prevent the disclosure of protected health information. The pleadings and the Court's prior orders are not sealed. The Court finds this Order also may be publicly filed.

Complaint [Doc. No. 33] and the Supplemental Complaint [Doc. No. 65]. The individual claims of A.B.'s parents, Will and Sherri Blaik, were dismissed in September 2021. *See* 9/23/21 Order [Doc. No. 57]. Federal jurisdiction is based on diversity of citizenship, and the substantive law of Oklahoma applies. Plaintiff claims that Defendant withheld payment for a covered service, Applied Behavior Analysis ("ABA") therapy, from April 2019 to October 2019 and then mishandled and denied ABA therapy claims throughout the remainder of A.B.'s treatment by the service provider.[3] Claims regarding ABA therapy services from August 2020 (when the Second Amended Complaint was filed) to November 2021 were added by the Supplemental Complaint.

Following discovery, Defendant now moves for summary judgment on all claims or, alternatively, Plaintiff's bad faith claim. Defendant asserts that Plaintiff cannot prevail for the following reasons: 1) At no time between April 2019 and November 2021 was ABA therapy "medically necessary" for A.B.'s condition; 2) Defendant's preauthorization decisions – where it was asked to approve the therapy provider's treatment plan for A.B. before the services were provided – are not actionable; 3) Defendant's delay in paying for Plaintiff's ABA therapy services between April and October 2019 did not cause any damages; and 4) any claim based on Defendant's denial of payment for ABA therapy services after April 2021 is barred by Plaintiff's failure to exhaust the appeal process provided by the contract. Defendant asserts that Plaintiff cannot establish bad faith because

---

[3] Claims for ABA therapy received by A.B. before April 5, 2019, were resolved by mutual agreement in prior litigation and are not at issue in this case. *See A.B. ex rel. Blaik v. Health Care Serv. Corp.*, Case No. CIV-14-990, Sealed Order (W.D. Okla. Apr. 5, 2019) ("*Blaik I*").

Defendant had a good-faith belief that ABA therapy was not medically necessary for A.B.'s condition, and because Plaintiff failed to disclose a primary diagnosis that A.B. received in 2019 and so withheld material information to a determination of medical necessity.

## Standard of Decision

Summary judgment is proper "if the movant shows there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A material fact is one that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue is genuine if the evidence is such that a reasonable jury could return a verdict for either party. *Id.* at 255. All facts and reasonable inferences must be viewed in the light most favorable to the nonmoving party. *Id.*

The movant bears the initial burden of demonstrating the absence of a dispute of material fact warranting summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). If the movant carries this burden, the nonmovant must then "set forth specific facts" that would be admissible in evidence and that show a genuine issue for trial. *See Anderson*, 477 U.S. at 248; *Celotex*, 477 U.S. at 324. "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998); *see* Fed. R. Civ. P. 56(c)(1)(A). The Court's inquiry is whether these facts present "a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52.

**Statement of Facts** [4]

Since August 2008, A.B. has had health insurance coverage under a group policy offered by Defendant called "Health Check *Select Care*." The policy requires Defendant to pay for covered services that the insured receives from a hospital or other provider subject to a "Medical Necessity Limitation." *See* Def.'s Mot. Summ. J., Ex. 10 [Doc. No. 136-11] at 13, 28 (ECF page numbering) (hereafter, "Policy").[5] The limitation provides: "This program provides Benefits for Covered Services that are Medically Necessary." *Id*.[6] It then states the definition of "Medically Necessary," which as amended in 2015 states:

> **Medically Necessary (or Medical Necessity)** – Health care services that the Plan determines a Hospital, Physician, or other Provider, exercising prudent clinical judgment, would provide to a patient for the purpose of preventing, evaluating, diagnosing or treating an illness, injury, disease or its symptoms and that are:
>
> • in accordance with generally accepted standards of medical practice;

---

[4] Plaintiff has responded to Defendant's facts with narrative statements containing few citations to the record. Plaintiff similarly presents additional facts in argumentative statements that generally lack citations to supporting materials. This briefing style does not satisfy Fed. R. Civ. P. 56(c)(1)(A) or LCvR56.1(d). The Court endeavors in this section to state facts properly presented by the parties that are not adequately opposed. To the extent this endeavor falls short, the Court exercises its discretion under LCvR56.1(e) to deem admitted facts that are not specifically controverted. The Court disregards facts that are not adequately supported.

As to briefing style, Defendant's approach of submitting a voluminous record of exhibits that are repetitive (including exhibits already in the record) and overinclusive (in that some do not relate to the issues presented) is not helpful. Defendant's appendix of roughly 1300 pages is excessive and does not strengthen Defendant's summary judgment position.

[5] Because the policy consists of multiple documents, the Court uses the page numbers supplied by the electronic case filing (ECF) system for ease of reference.

[6] In addition to the Medical Necessity Limitation, the policy contains an exclusion stating that "we do not provide benefits for services . . . [w]hich we determine are not Medically Necessary, except as specified." *Id.* at 50.

• clinically appropriate, in terms of type, frequency, extent, site and duration, and considered effective for the patient's illness, injury or disease; and

• not primarily for the convenience of the patient, Physician, or other health care Provider, and not more costly than an alternative service or sequence of services at least as likely to produce equivalent therapeutic or diagnostic results as to the diagnosis or treatment of that patient's illness, injury or disease.

*Id*. at 116.  For covered services such as ABA therapy, the policy requires service providers to request a prior determination of medical necessity through a precertification or preauthorization process.  Obtaining precertification does not relieve a provider from submitting post-service claims or guarantee that payment will be made, but it does prevent Defendant from denying the provider's claims as not medically necessary.  When a service is provided and a claim is submitted without preauthorization or after preauthorization was denied, Defendant determines whether medical necessity is met when processing the claim.

A.B. was diagnosed at a young age with hypoplasia of the corpus callosum ("HCC"), a congenital condition in which a central bundle of nerve fibers between the two hemispheres of the brain is not fully developed or is absent.  *See Blaik I*, Order of Feb. 12, 2018, 2018 WL 840764, at *2 & n.4.  This condition caused multiple developmental deficits for which A.B. was prescribed treatment, including ABA therapy, when she was five years old.  ABA therapy "is an intensive one-on-one therapy designed to analyze a person's maladaptive behavior and eliminate those behaviors through repetitive performance of modified behaviors." *Id*. at *2.  When the present dispute began in April 2019, A.B. was ten years old.

A.B. received ABA therapy from Therapy and Beyond ("T&B") from April 8, 2019, to October 2019 without payment to T&B until Defendant approved outstanding claims in October 2019.[7]  T&B did not request precertification of its services but instead submitted post-service claims for ABA therapy that it provided to A.B. from April 8, 2019, forward. During this time, A.B. was receiving direct treatment approximately 12.5 hours per week. Before acting on the claims, Defendant requested additional information from T&B by letters sent in July and August 2019.  T&B did not receive these letters until August 16, 2019, due to a mailing error.  T&B provided clinical information on September 9, 2019, and Defendant authorized payment of T&B's post-service claims on October 1, 2019.

T&B also submitted on September 11, 2019, a request for precertification of comprehensive services including more than 40 hours per week of ABA therapy for A.B. To allow time for consultation, Defendant temporarily authorized 45 hours per week of ABA therapy services from September 11, 2019, through October 2, 2019, which was later extended to October 25, 2019.  Ultimately, all T&B's claims for services provided from April through October 2019 were paid.  During this period, T&B never refused to provide services to A.B., did not seek payment from A.B. or her parents, and did not change A.B.'s therapy schedule due to a lack of payment.[8]

---

[7] As noted, any payment for services that A.B. received before April 8, 2019, was resolved through the settlement of *Blaik I.  See supra* note 3.

[8] The last stated fact is supported by the deposition testimony of Sherri Blaik and T&B's designated witness that the delay in payment from April to October did not affect A.B.'s treatment schedule.  In opposition to Defendant's Motion, Plaintiff attempts to dispute this fact by submitting the affidavit of Sherri Blaik stating that T&B waited to learn whether Defendant would cover ABA therapy for A.B. before recommending a comprehensive level of treatment that T&B believed was necessary.  *See* Blaik Aff. [Doc. No. 152-4], ¶¶ 3, 11-12, 14.  The affidavit provides no specific

Defendant initially denied T&B's request for precertification of services to be provided after October 25, 2019. In November 2019, however, Defendant reversed course and authorized comprehensive ABA therapy services (45 hours per week) for a six-month period from October 26, 2019, to April 26, 2020. Plaintiff points out that this abrupt and largely unexplained change of position followed the filing of this lawsuit on October 23, 2019.[9] Defendant stated that the decision to authorize this level of service was made to explore the effectiveness of comprehensive treatment to ameliorate A.B.'s deficits. T&B provided an average of approximately 30 hours per week of ABA therapy to A.B. during this time period, and Defendant paid all T&B's post-service claims.

On April 3, 2020, T&B submitted a request for precertification of the same level of services for another six months and provided a report documenting A.B.'s progress. On April 17, 2020, T&B submitted a revised request to include a schedule of services that Defendant had requested. The same day, Defendant issued a precertification decision that approved as medically necessary only 17.25 hours per week for the next six months, from April 26, 2020, to October 27, 2020. Two reasons were given: 1) the proposed treatment schedule showed A.B. receiving ABA therapy simultaneously with attending school,

---

facts to show how Mrs. Blaik knew of T&B's belief or intention to increase services – that is, that she has personal knowledge of these matters as required by Fed. R. Civ. P. 56(c)(4). In fact, T&B recommended an increase in services in its first request for precertification in September 2019, before Defendant had made a coverage decision. The Court finds the fact that T&B did not change A.B.'s treatment due to the delay in payment is not addressed by Plaintiff in the manner required by Rule 56(c)(1)(A) and considers it undisputed. *See* Fed. R. Civ. P. 56(e)(2).

[9] Following a medical review on October 24, 2019, that concluded increased services were not needed, the same reviewer made a terse note on November 4, 2019, stating that "a decision was made to authorize an increased level of services to give [A.B.] a chance to improve." *See* Mot. Summ. J., Ex. 16 [Doc. No. 136-17] at 3.

contrary to Defendant's guidelines that prohibited services during classroom participation; and 2) the progress report indicated that the comprehensive level of services had not resulted in "significant improvement." *See* Mot. Summ. J., Ex. 26 [Doc. No. 136-27] at 1. Plaintiff points out that this reasoning ignores the disruption of A.B.'s routine and isolation caused by the COVID-19 pandemic and the fact that school closures prevented A.B. from attending school because she was unable to participate in remote learning.

T&B appealed Defendant's April 2020 preauthorization decision. The appeal was assigned to a licensed psychiatrist, Dr. Thomas Krajewski, who was not involved in the initial decision and was not Defendant's employee. He upheld the decision to authorize only 17.25 hours per week of ABA therapy because the progress report did not show improvement in critical areas and T&B did not sufficiently explain how ABA therapy would be delivered during school hours without interfering with the educational process. During the six-month period beginning April 26, 2020, T&B provided an average of approximately 18 hours per week of ABA therapy to A.B. For service hours that exceeded the precertification, Plaintiff paid T&B separately and submitted claims for reimbursement. Defendant paid all claims submitted by both T&B and Plaintiff during this period.[10]

---

[10] Plaintiff purports to dispute this fact with a conclusory statement that "there were additional claims for ABA therapy during this time that were denied by [Defendant]" and a citation to a 67-page exhibit that is a collection of explanation-of-benefits ("EOB") forms addressed to Plaintiff. *See* Resp. Br. at 11, citing Pl.'s Ex. 8a [Doc. No. 152-8]. The Court has reviewed the first two EOB's for services provided during April and May 2020 (pages 1-15 of the exhibit); all T&B's claims were paid in May and June 2020 respectively. The Court declines to go further; it has no obligation to search the record for evidence to support Plaintiff's position. *See Doe v. Univ. of Denver*, 952 F.3d 1182, 1191 (10th Cir. 2020); *Mitchell v. City of Moore*, 218 F.3d 1190, 1199 (10th Cir. 2000). Thus, the Court considers this fact to be undisputed under Rule 56(e)(2).

On October 2, 2020, T&B submitted a request for precertification of services for another six months, through April 2021, of approximately 30.5 hours per week of ABA therapy for A.B.  Defendant requested additional information regarding A.B.'s treatment schedule to show when ABA therapy would occur in relation to A.B.'s school attendance and other therapies; T&B responded that A.B. had school virtually on a flexible schedule without set hours.  On October 23, 2020, Defendant issued a precertification decision that approved only 18.75 hours per week through April 28, 2021.  The stated reason was that a medical necessity review showed A.B. was making progress at the existing level of services and an increase was not needed.  T&B appealed; the appeal was assigned to Dr. Krajewski; and he again concurred in the decision.  T&B pursued a second level of appeal, and another psychiatrist, Dr. Phillip Helding, also concurred.  During this service period, T&B provided an average of approximately 16 hours per week of ABA therapy for A.B.  Defendant paid all claims submitted by T&B and Plaintiff for this period.[11]

On April 9, 2021, T&B requested precertification of 30.5 hours per week for the next six months and, as with prior requests, submitted a progress report.  Defendant denied this request on April 28, 2021.  Defendant decided that ABA therapy should no longer be covered because the report showed a lack of improvement and A.B. had reached a plateau, with behavior "at similar levels despite 3 years of intervention."  *See* Mot. Summ. J., Ex. 45 [Doc. No. 136-46].  Although Plaintiff disagrees with this conclusion, she does not address

---

[11]  Like the prior six-month period, Plaintiff makes a conclusory statement that some ABA therapy claims were denied and cites a 62-page exhibit of EOB forms.  *See* Resp. Br. at 12, citing Pl.'s Ex. 8b [Doc. No. 152-9].  For the same reasons previously stated, the Court finds that Plaintiff's response is insufficient and considers this fact undisputed.  *See supra* note 11.

the progress report except to show that T&B prepared an updated report in response to the denial that demonstrated A.B.'s progress. This fact seems to concede rather than refute that the report submitted with the precertification request did not sufficiently show A.B.'s improvement.[12]

In May 2021, T&B appealed the decision to discontinue coverage of ABA therapy services. A psychiatrist who was not involved in the initial decision, Dr. Rasik Lal, upheld the decision despite additional information from T&B. Dr. Lal expressed the opinion that "corpus callosum problems change at age 11," "the likelihood of further significant improvement [after age 11] is almost zero," and at 12 years old A.B. was "not likely to develop further." *See* Resp. Br., Ex. 11 [Doc. No. 152-13], Tr. at 8:17-24, 9:11-13. T&B pursued two more levels of appeal without success; two other psychiatrists agreed with the initial decision. One of them, Dr. Helding, stated he was unaware of scientific evidence that further ABA therapy would result in significant improvement. *See* Mot. Summ. J., Ex. 49 [Doc. No. 136-50]. Defendant informed Plaintiff that the denial decision was final, and all appeals had been exhausted, by letter dated September 3, 2021.

After the unsuccessful appeals, T&B continued to provide ABA therapy services to A.B. and submit post-service claims. Consistent with its preauthorization decision, Defendant denied the claims. Neither T&B nor Plaintiff appealed these denials. In October 2021, Plaintiff decided to discontinue services from T&B effective November 19, 2021.

---

[12]    Plaintiff also points to a statement in Sherri Blaik's affidavit that A.B. showed considerable improvement as a result of ABA therapy. *See* Resp. Br. at 12, citing Blaik Aff. ¶ 13. This statement is neither tied to the October 2020 to April 2021 time frame nor does it address T&B's progress report for this period. Thus, it does not demonstrate a disputed fact.

As additional material facts, Plaintiff points out that the record shows Defendant took no action on T&B's April 2019 claims for approximately three months, despite a policy provision promising a benefit determination within 30 days or notice that additional time was needed.  *See* Policy at 64-65.  Plaintiff points out that the first precertification in 2019 was made under circumstances that could be viewed as coercive, in that the reviewer pressured the therapy provider to lower the recommended hours of service and stated no services would be authorized if the provider would not agree.  This type of negotiation of ABA therapy precertification requests is part of Defendant's standard operating procedure. *See* Resp. Br., Ex. 14 [Doc. No. 152-16].  Plaintiff asserts that the circumstances surrounding the first (and only) precertification of comprehensive services in November 2019 could be viewed as a response to this lawsuit.

Plaintiff also shows that Defendant's unfavorable coverage decisions were based on an internal medical policy regarding ABA therapy for autism spectrum disorder. Reviewing physicians also applied this medical policy and routinely agreed with the initial decision.  This policy provided that approval of ABA therapy required an autism diagnosis. *See id*., Ex. 18 [Doc. No. 152-20].  More than once, both the initial decisionmaker for a precertification request and the reviewing physicians relied on the fact that A.B. did not have an autism diagnosis.  *See*, *e.g.*, *id*. Ex. 3 [Doc No. 152-3].  Finally, Defendant utilized contract physicians who were not licensed in the State of Oklahoma, contrary to state law. *See* Okla. Stat. tit. 36, § 1250.5(10).

11

## Discussion

### A.    Medical Necessity

Defendant first asserts that Plaintiff cannot establish either a contract or bad faith claim because the policy did not cover ABA therapy services for A.B. at any time between April 2019 and November 2021.  Invoking the Medical Necessity Limitation, Defendant contends Plaintiff must prove ABA therapy was medically necessary by showing that 1) A.B. had a valid prescription or order from a licensed physician or psychologist and 2) all elements of the definition of "medically necessary" are met.  On the latter point, Defendant relies on the opinions of its retained expert to argue that ABA therapy is not consistent with generally accepted standards of medical practice for A.B.'s conditions and is not considered effective for any of A.B.'s diagnoses.  *See* Mot. Summ. J. at 18-21.[13]

Plaintiff responds that Defendant's argument is inconsistent with the historical facts.  Defendant made a medical necessity determination in Plaintiff's favor multiple times when it authorized T&B's services and paid for A.B.'s treatment.  Defendant approved the ABA therapy services that A.B. received from April to September 2019, the full level of services requested from September 2019 through April 2020, and a lesser level of services from April 2020 through April 2021.  Plaintiff contends "[t]he only 'medical necessity' factual issue in dispute is whether or not the additional hours requested by [A.B.'s] medical providers were also medically necessary – in addition to

---

[13]  In its reply brief, Defendant argues why Plaintiff bears the burden of proof on this issue but alternatively asserts that it has shown a lack of medical necessity.  *See* Reply Br. at 5 n.4.

the hours that were determined to be medically necessary by [Defendant]." *See* Resp. Br. at 20.

Defendant's only response to this argument is to deny that its favorable coverage decisions were based on proof of medical necessity. *See* Reply Br. at 5-6 (ABA therapy was covered "despite the lack of evidence of medical necessity"). Defendant notes that precertification decisions made in November 2019, April 2020, October 2020, and April 2021 were accompanied by statements questioning whether ABA therapy was shown to be effective for HCC and whether the approved level of services was medically necessary. *See* Reply Br. at 6.

The Court finds that Defendant attempts through its summary judgment position to litigate coverage conditions that were met or waived when it approved and paid T&B's claims for ABA therapy services. Despite the concerns expressed by medical reviewers, Defendant preauthorized ABA therapy for A.B. and paid post-service claims from 2019 until 2021. Further, Defendant's argument that ABA therapy was never a covered service for A.B. is inconsistent with its position on other summary judgment issues. For example, Defendant ostensibly delayed payment to T&B for services provided between April and October 2019 because precertification had not been requested and Defendant needed to determine medical necessity. *See* Mot. Summ. J. at 7, ¶ 13 ("Rather than denying T&B's post-service claims for failure to seek precertification, [Defendant] reached out to T&B . . . so that Defendant could determine whether the claims for ABA therapy were medically necessary under A.B.'s policy."); *id*. at 26 (relying on this asserted fact to negate bad faith). Defendant also asserts that Plaintiff cannot show bad

faith because Defendant granted precertification of some ABA therapy services and paid T&B's post-service claims for approximately two years, highlighting that only part of the services failed a medical necessity test. *See id*. at 26. Defendant provides no legal authority for the proposition that it can now rewrite its coverage decisions by asserting that ABA therapy was never a covered service and demanding that Plaintiff prove otherwise.[14]

In short, the Court finds that Defendant has not shown it is entitled to summary judgment on the first proposition urged, that is, Plaintiff cannot prove any of the ABA therapy services provided to A.B. were medically necessary.[15]

## B.    Preauthorization Decisions

Defendant asserts that Plaintiff cannot prove a claim for breach of contract based on Defendant's denials of T&B's requests for precertification of services because the policy does not require Defendant to approve precertification requests and instead provides that Defendant is only liable for wrongly denying post-service claims. Defendant characterizes a precertification decision as a "condition precedent to coverage" under the policy but contends a precertification denial bears no contractual consequences. *See* Mot. Summ. J. at 21-22; Reply at 21-22. Plaintiff disagrees with

---

[14] In attempting to litigate coverage, for example, Defendant calls for Plaintiff to produce a prescription for services provided from 2019 to 2021 based on its current position that a 2013 prescription from A.B.'s physician was invalid after five years. However, the validity of the prescription was not questioned at the time of Defendant's coverage decisions.

[15] In light of this conclusion, the Court need not decide which party has the burden of proof on this issue. The Court notes, however, the policy lists a lack of medical necessity as an exclusion from coverage, which an insurer would ordinary be required to prove.

the premise of this argument.  Plaintiff contends a precertification decision that is a condition of coverage obliges the insurer to perform its precertification review in good faith and in accordance with the policy terms.

Upon consideration, the Court is not persuaded by Defendant's argument.  One cannot leap from the proposition that Defendant had no obligation to approve precertification requests to the conclusion that it could exercise its power to deny precertification with impunity.  Defendant concedes that a precertification request triggers a duty to make a medical necessity determination.  Under its own authority, a breach of contract is a material failure to perform a duty imposed by the agreement.  *See* Mot. Summ. J. at 21 (quoting *Milroy v. Allstate Ins. Co.*, 151 P.3d 922, 926 (Okla. Civ. App. 2006)); Reply Br. at 9 n.8.  Here, the duty allegedly breached is Defendant's contractual obligation to perform a medical necessity review in accordance with the terms of the policy.

Neither party provides legal support for their position on an insurer's duty regarding precertification decisions.  Although the Court has found no Oklahoma case on point, other courts have determined that the duty of good faith advocated by Plaintiff is implied in an insurer's agreement to pay for covered health care services.  *See McKenzie v. Pac. Health & Life Ins. Co.*, 118 Or. App. 377, 381, 847 P.2d 879, 881 (1993) ("within defendant's obligation to pay all covered claims was the duty to determine, in good faith, whether a claim is covered, and to refrain from arbitrarily refusing to pre-authorize medical treatment").  The duty to make preauthorization decisions in good faith was further explained in *Eggiman v. Mid-Century Ins. Co.*, 134

Or. App. 381, 895 P.2d 333, 336 (1995), which concerned personal injury protection ("PIP) coverage under an automobile insurance policy. There, the court rejected the insurer's position that it had no express contractual duty to preauthorize medical treatment so it had no duty to act in good faith when making a preauthorization decision. The court explained:

> As in *McKenzie*, a duty to preauthorize in good faith is properly implied because, absent such a duty, a PIP insurer could avoid its contractual obligations altogether by arbitrarily withholding preauthorization. Without preauthorization—without assurance that the insurer will pay the cost of treatment—medical providers may refuse to provide the treatment, or PIP insureds may feel compelled not to obtain covered treatment, frustrating contractual expectations.

*Id*. (footnote omitted). These decisions are consistent with Oklahoma law imposing a duty of good faith on contractual provisions that give one party discretion to perform. *See*, *e.g.*, *EKE Builders, Inc. v. Quail Bluff Assoc*., 714 P.2d 604, 608 (Okla. Civ. App. 1985) (where construction contract was contingent on property owner obtaining construction loan, the owner was "obliged to make a good faith effort to obtain the required loan").

Viewed in this way, the Court finds that Defendant has not shown it is entitled to summary judgment on the ground that a preauthorization decision cannot form the basis of a breach of contract claim.

## C.    Causation of Damages

Defendant also asserts that its delayed payments to T&B for services provided to A.B. from April through October 2019 did not cause any damages. Defendant argues, based on deposition testimony, that T&B did not refuse to provide any services, change

16

A.B.'s therapy schedule, or seek payment from Plaintiff because it went unpaid for several months.  Defendant thus seeks a determination as a matter of law that any breach of contractual duties based on its nonpayment of T&B's claims for several months did not cause Plaintiff to suffer any damages.

Under Oklahoma law, the essential elements of a breach of contract claim are: "1) formation of a contract; 2) breach of the contract; and 3) damages as a direct result of the breach."  *See Digital Design Grp., Inc. v. Info. Builders, Inc*., 24 P.3d 834, 843 (Okla. 2001); *accord Cates v. Integris Health, Inc.*, 412 P.3d 98, 103 (Okla.), *cert. denied*, 138 S. Ct. 2659 (2018).  Here, the existence of an insurance contract is undisputed, and Defendant assumes its delay in processing T&B's claims for ABA therapy provided from April to October 2019 may breach the contract.  Defendant challenges the third element of a contract claim, namely, that Plaintiff suffered damages as a direct result of the breach.

Plaintiff's response on this issue is a speculative argument that Defendant's delay deprived A.B. of timely treatment with a comprehensive course of ABA therapy that could have ameliorated her deficits.  Plaintiff contends Defendant's failure to respond to T&B's claims for April 2019 services created uncertainty about whether Defendant would cover ABA therapy for A.B. and T&B was unwilling to provide the level of services that it believed was medically necessary until Defendant made a coverage decision.  This argument is unsupported by a presentation of facts in the manner required by Rule 56.  *See supra* n.8.  Thus, the Court finds that Plaintiff has failed to demonstrate a genuine dispute of material fact on the issue of damages caused by Defendant's delay of payment.

Therefore, the Court finds that Defendant has shown that it is entitled to summary judgment on the damages issue raised by its Motion.  The Court rules as a matter of law that Plaintiff cannot recover damages for Defendant's delayed payments to T&B for services it provided from April to October 2019.

## D.    Administrative Exhaustion

Defendant seeks to enforce a contractual requirement that Plaintiff must exhaust a two-level internal appeals process before filing suit.  Defendant asserts that "Plaintiff did not appeal any denial of post-service claims after April 26, 2021," and thus "the insurance policy's express terms bar Plaintiff's lawsuit to the extent it is based on such decisions."  *See* Mot. Summ. J. at 24.  Defendant contends Plaintiff's claims based on denials of coverage after April 26, 2021, are barred by noncompliance with a policy provision that imposes a mandatory precondition to suit.

Plaintiff disputes that she failed to satisfy the exhaustion requirement, arguing that T&B completed the appeals process on A.B.'s behalf when T&B sought review of Defendant's precertification decision that ABA therapy services were not medically necessary after April 28, 2021.[16]  Plaintiff contends a new appeal was not required each time a post-service claim was denied based on that decision, particularly when the appeals process was ongoing when the claims were made.  Alternatively, Plaintiff asserts that any noncompliance should be excused as futile, given that Defendant completed a full medical review of the decision to discontinue coverage and reached a final

---

[16]  The Complaint/Appeals Procedure of the policy expressly allows a provider to appeal for the insured.

determination that A.B. would not benefit from further ABA therapy, in part, due to her age.

The Court has previously decided in ruling on a Rule 12(b)(6) motion raising this issue: "Defendant's assertion that A.B.'s contract claim is barred by her failure to complete an administrative appeals process mandated by the policy is an affirmative defense rather than an element of her claim." *See* 9/23/21 Order [Doc. No. 57] at 15. Accordingly, Defendant bears the burden to prove that it is entitled to summary judgment on Plaintiff's claims that are allegedly foreclosed by a lack of administrative exhaustion.

"In Oklahoma, unambiguous insurance contracts are construed, as are other contracts, according to their terms." *Max True Plastering Co. v. U.S. Fid. & Guar. Co.*, 912 P.2d 861, 869 (Okla. 1996); s*ee May v. Mid-Century Ins. Co.*, 151 P.3d 132, 140 (Okla. 2006) (to determine a party's obligations under an insurance contract, "we must examine the provisions of the policy"). "The terms of the parties' contract, if unambiguous, clear, and consistent, are accepted in their plain and ordinary sense, and the contract will be enforced to carry out the intention of the parties as it existed at the time the contract was negotiated." *Dodson v. St. Paul Ins. Co.*, 812 P.2d 372, 376 (Okla 1991); *see May*, 151 P.3d at 140 ("Where the language of a contract is clear and unambiguous on its face, that which stands expressed within its four corners must be given effect.").

Defendant relies for its administrative exhaustion defense on a provision of the policy stating that an insured "must exhaust the Appeal Process (Level I) and Re-review

Process (Level II) before pursuing other legal remedies." *See* Mot. Summ. J. at 23-24.[17] Case law supports the general proposition that an unambiguous policy provision that requires an insured to exhaust an appeal process before filing suit is enforceable under Oklahoma law. *See Evans v. Kirke-Van Orsdel*, 122 F. App'x 947, 949 (10th Cir. 2004) (unpublished) (Oklahoma substantive law governed disability benefit plan).[18] In *Evans*, the insured employee failed to appeal a denial of disability benefits to an annuity board identified in the insurance plan, despite receiving written notice of the right to appeal. After rejecting numerous arguments made by the insured, the court of appeals concluded that summary judgment was properly granted to the defendants due to the plaintiff's "unexcused failure to satisfy the plan's exhaustion requirement." *Id*. at 952.

Here, Defendant's exhaustion argument is more nuanced. Defendant contends Plaintiff was required to exhaust the appeals process repeatedly. Defendant asserts that even though Plaintiff completed both levels of appeals when it denied precertification of coverage for ABA therapy services for A.B. after April 28, 2021, Plaintiff was also required to complete both levels of appeals when Defendant later denied claims for services provided after April 28, 2021, based on that precertification decision. Defendant relies for this position on language in the Complaint/Appeal Procedure

---

[17] Defendant provides a citation to the record that is incorrect, in that the page number ("Ex. 10 at HCSC-AB-0000703") does not exist. The citation most likely reflects a typographical error; a similar provision appears in the original policy at bates-numbered page HCSC-AB-000070. However, the policy was amended in 2006 to replace the Complaint/Appeal Procedure provision with a new one that contains the statement quoted by the Court. *See* Policy at 101 (ECF page numbering).

[18] Unpublished opinion cited pursuant to Fed. R. App. P. 32.1(a) and 10th Cir. R. 32.1(A).

provision that states procedures for appealing both adverse benefit determinations and precertification decisions, and an absence of language in the policy stating that an insured need not appeal both decisions. *See* Reply Br. at 12 (citing Policy at 100-01). Defendant argues that its interpretation of the policy is a common sense reading because, even though precertification is denied, appealing the denial of a post-service claim could yield a different result and would provide an opportunity to supply additional, updated information.

Upon consideration, the Court is unable to conclude that Defendant's view of the exhaustion requirement is supported by an unambiguous policy provision, particularly as applied to the facts of this case. There is no question that Plaintiff exhausted the appeals process regarding Defendant's decision to discontinue coverage of ABA therapy services for A.B. when precertification was denied on April 28, 2021. It is undisputed that the final, second-level review of the noncoverage decision was not completed until September 2021. Defendant has not identified any language of the policy that would require Plaintiff to restart the appeal process each time Defendant denied a post-service claim based on its precertification decision (which was still under review) and repeat the entire process for each denial of coverage for services in an ongoing course of treatment. Even if Defendant's "common sense" argument is considered, Defendant does not explain why T&B should be required to initiate a new appeal process in order to submit additional clinical information or assessments. T&B did actually submit an updated assessment for A.B. during the appeal process that was completed.

In short, the Court finds that Defendant's exhaustion defense cannot be decided as a matter of law on the record presented.

**E.     Bad Faith**

To establish a breach of Defendant's duty of good faith and fair dealing, Plaintiff must show that Defendant breached the insurance contract and, in so doing, acted in a manner constituting bad faith. *See Brown v. Patel*, 157 P.3d 117, 121 (Okla. 2007); *see also Badillo v. Mid Century Ins. Co.*, 121 P.3d 1080, 1093 (Okla. 2005) (per curiam). The elements of a bad faith claim are "(1) the claimant was entitled to coverage under the insurance policy at issue; (2) the insurer had no reasonable basis for delaying [or denying] payment; (3) the insurer did not deal fairly and in good faith with the claimant; and (4) the insurer's violation of its duty of good faith and fair dealing was the direct cause of the claimant's injury." *Ball v. Wilshire Ins. Co.*, 221 P.3d 717, 724 (Okla. 2009).[19]

Defendant first seeks summary judgment on Plaintiff's bad faith claim on the ground that Plaintiff cannot establish the second element. Defendant contends the undisputed facts show it had a reasonable basis for initially delaying payment, refusing to authorize ABA therapy services at the level T&B requested, and denying payment after April 2021: a good faith inquiry and determination that ABA therapy was not medically necessary for A.B.'s HCC diagnosis.

---

[19] To establish the second element, a plaintiff must prove that the insurer's "refusal to pay the claim in full was unreasonable under the circumstances because (a) it had no reasonable basis for the refusal, (b) it did not perform a proper investigation, or (c) it did not evaluate the results of the investigation properly." *See Duensing v. State Farm Fire & Cas. Co.*, 131 P.3d 127, 138 (Okla. Civ. App. 2006) (citing OUJI–CIV (2d) 22.2).

Upon consideration of the facts shown by the summary judgment record with all reasonable inferences drawn in Plaintiff's favor, as required by Rule 56, the Court finds there is a genuine dispute of material fact as to whether Defendant acted in bad faith in delaying and refusing coverage for ABA therapy services provided to A.B. Plaintiff has demonstrated minimally sufficient facts regarding Defendant's handling of claims for coverage of ABA therapy for A.B. that could reasonably be found to show bad faith conduct in breach of the policy. Solely as a limited example, Plaintiff has shown that Defendant made no response to T&B's April 2019 claims for months, pressured T&B to reduce the initial precertification requests, refused to authorize comprehensive ABA therapy services after the first six-month period ended in April 2020, terminated ABA therapy coverage when A.B. reached 12 years of age, and utilized contract physicians who were not licensed to practice in Oklahoma. Regardless of the Court's view of the facts presented, the Court simply concludes that reasonable jurors could find from the summary judgment record that Defendant acted in bad faith by failing to cover ABA therapy services that were needed to treat A.B.'s condition.

Alternatively, Defendant asserts that Plaintiff cannot prevail on her bad faith claim because undisputed facts show she withheld important information bearing on Defendant's determination of coverage. This argument refers to facts presented in Defendant's Motion that A.B. received a primary diagnosis in February 2019 of a rare genetic disorder, Skraban-Deardorff syndrome, that was never disclosed by T&B or Plaintiff when making their claims. Defendant contends this information was material to its coverage decisions

and Plaintiff's misconduct in withholding the information prevents her from any recovery for Defendant's bad faith conduct (if any was committed).

Setting aside whether Defendant's argument accurately states Oklahoma law, the Court finds that a genuine dispute of material fact prevents a resolution of this potential defense to a bad faith claim as a matter of law. Defendant has not presented undisputed facts that show the additional diagnosis that A.B. received in February 2019 was material to a determination whether ABA therapy was a covered service for her HCC condition.

### Conclusion

For these reasons, the Court finds that genuine disputes of material facts exist and that Defendant is not entitled to summary judgment on any ground asserted in its Motion except the recovery of damages based on Defendant's delay in paying for ABA therapy services provided from April to October 2019. Subject to this ruling on one item of damages, this case shall proceed to trial on Plaintiff's claims for breach of contract and insurer's bad faith.

**IT IS THEREFORE ORDERED** that Defendant's Motion for Summary Judgment [Doc. No. 136] is **GRANTED** in part and **DENIED** in part.

**IT IS SO ORDERED** this 17th day of September, 2024.

_____
TIMOTHY D. DeGIUSTI
Chief United States District Judge